UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                          Case No. 16-CR-176

CHRISOPHER EKLUND,

        Defendant.

## UNITED STATES' SENTENCING MEMORANDUM

The United States of America, by its attorneys Matthew D. Krueger, United States Attorney, and Benjamin W. Proctor, Assistant United States Attorney, and Ralph Paradiso, Trial Attorney with the Child Exploitation and Obscenity Section of the Department of Justice, and in accord with 18 U.S.C. § 3553(a) and the United States Sentencing Commission, *Guidelines Manual*, files this Position of the United States with Respect to Sentencing in the instant case.

## I.    INTRODUCTION

Christopher EKLUND faces sentencing after pleading guilty on November 2, 2018, to one count of distributing child pornography, in violation of 18 U.S.C. § 2252A(a)(2). He faces up to 20 years' imprisonment and up to life on supervised release.

EKLUND pleaded guilty under Federal Rule of Criminal Procedure 11(c)(1)(C), which, if accepted by the Court, binds the Court to a sentence agreed to

1

by the parties. Here, the parties agree that the sentence must include a prison term of least 96 months and no more than the high-end of the guidelines as calculated by the Court. Doc. #21 ¶ 21. The plea agreement provides that EKLUND will seek a sentence that includes no less than 96 months imprisonment, which already accounts for time he spent in Chinese custody before his federal arrest in this case. Doc. #21 ¶ 21. The government will seek a sentence within the applicable guidelines range, which the parties agree will be 151 to 188 months imprisonment. Doc. #21 ¶ 21. As part of the plea agreement, the government will dismiss the charge of advertising child pornography, in violation of 18 U.S.C. § 2251(d)(1)(A), which carries a sentence of 15 to 30 years imprisonment.

As discussed below, EKLUND was a persistent consumer and distributor of child pornography who eagerly collected and shared graphic images and videos of young children being raped and sodomized. His conduct went well beyond a passive interest in child pornography; on top of actively engaging a child-pornography community on Gigatribe, EKLUND groomed and sexually touched children who were entrusted to his care. The United States respectfully submits that a prison sentence within the applicable guidelines range is appropriate.

## II.  BACKGROUND

Christopher EKLUND was a user of Gigatribe, a publicly available peer-to-peer file-sharing network that establishes private network connections between users. Gigatribe provides users with a password-protected account and a profile page. A user of Gigatribe is not able to see or access another user's files unless one

2

user has invited the other and the other has accepted the invitation. Ultimately, Gigatribe allows users to securely download and share files, as well as chat, through an encrypted network. EKLUND was a prolific trader of child pornography on Gigatribe, advertising and distributing thousands of images and videos to his network of "friends."

The investigation into EKLUND started in 2011 when an FBI undercover agent in Milwaukee logged onto Gigatribe using an account that had been lawfully taken over from a user known to access child pornography. The undercover agent noticed that one of the user's friends, "Gigauser55," later identified as EKLUND, was online and sharing a large volume of files. The agent browsed EKLUND's page, which included a banner message at the top and separate tabs for "profile," "folders," "chat," and "blog." EKLUND's banner message was not subtle: "300 gigs Preteen Content - Enjoy the Young Girls." EKLUND's "folders" tab revealed approximately 280 gigabytes of files (~187,500 files), most of which were child pornography, available for sharing. The agent downloaded thirteen child pornography files from EKLUND.

A short time thereafter, the agent's Gigatribe account received a friend invitation from "Gigadude555," which was EKLUND's new username (EKLUND regularly changed usernames while maintaining the same content). In January 2012, the agent browsed the folders being shared by Gigadude555 and again observed numerous videos and images of child pornography. There were a number of "chats" posted by Gigadude555 that included links to child pornography videos,

Case 2:16-cr-00176-LA   Filed 02/15/19   Page 3 of 22   Document 27

comments on the content of the videos, comments on other users he suspected were law enforcement agents, and comments on what he viewed as flaws in how Gigatribe operates.

While EKLUND made large amounts of child pornography available for sharing among for all his "friends" (his "default group"), he maintained a larger collection that was reserved for his "Best Traders Group." EKLUND was arrogant about his vast and organized collection, stating on his Gigatribe page that those who were not in his "Best Traders Group" were "missing out on half my collection and the GOOD HALF too." EKLUND articulated who could qualify for "Best Trader" status by setting seven criteria each user must meet. These terms included having more than 20 gigabytes of child pornography accessible to EKLUND, including "unique girl files that stimulate [him]," maintaining an organized file structure so EKLUND could easily navigate to files he found interesting, and chatting with EKLUND about child pornography. If a user met EKLUND's terms, EKLUND gave them special access to his "hidden collection." To entice others to meet his criteria, EKLUND posted a screenshot showing 182 folders containing child pornography files that were accessibly only to the "best traders."

On December 1, 2014, the FBI agent in Milwaukee again logged onto Gigatribe and observed that EKLUND, now going by "Kingofgiga55," was online and advertising that he had "Nearly 1TB of Goodies for You!" (meaning one terabyte of child pornography files available for others). The next day, December 2, 2014, the agent downloaded 10 child pornography images and videos directly from EKLUND's

computer. These child pornography files depicted children under the age of 12 years old engaged in sadistic, sexually explicit conduct with adults. Among these images were the following:

- An image depicting a naked prepubescent girl lying on a bed. An unknown man's penis can be seen partially inserted into the prepubescent girl's vagina. The word "Maxxx" and an additional word can be observed written on the girl's stomach.

- An image depicting a prepubescent girl wearing a striped top and naked from the waist down. The prepubescent girl has her legs spread and the child is using her hands to further expose her vagina.

- An image of a prepubescent girl straddling an adult male who is beginning to insert his penis into the girl's vagina. The girl is naked and looks to be in pain while staring at the camera.

On July 23, 2015, the FBI agent in Milwaukee again logged into EKLUND's "Kingofgiga55" account and reviewed the postings under the "chat" tab. Some of the postings contained thumbnail images of child pornography. In these chat messages, EKLUND states, among other things, that: (1) he created a new child pornography video from various internet clips (and included a hyperlink to the video); (2) he is upset with other Gigatribe users in his network because he provides "tons of shit" [child pornography] for other users to access in a well-organized manner and the other users do not reciprocate; (3) he had a hard-drive failure but was able to save all of his child pornography files; (4) he is searching for specific child pornography videos (which he lists); (5) he is a teacher and has a 10-year old female student in his class who he shows child pornography to and who he wants to have sex with (which he describes in great detail); (6) that he has a 7-year old female student in

5

his class who he shows child pornography to and who he will try to have sex with when the opportunity arises (which he describes in great detail), (7) and he asks about a child pornography video he saw on a Darknet website that he was unable to download.

In these chat sessions, EKLUND described to other users that he was moving beyond just viewing child pornography and acting out his desires. He wrote that he was hoping his goal of having sex with a child would come true soon, telling them how he was in love with one of his students and the steps he was taking to groom his students so he could fulfill his dream. In these chats, EKLUND stated:

> So now I have lucid dreams every night regarding pedophilia, I feel like I actually had the real experience, and tied with the glow I've been developing, it's better than the energy that any video CP watching could ever bring me, but still just shy of the real thing. I know the Universe is somehow working right now to deliver me the full pedophilia experience like few men ever have experienced it. A real child is going to come to my home, of her own volition, by choice, and give herself to me fully. And we will be true lovers, not coerced, but also loving and sweet. And the videos we will produce will shock the minds of pedophiles everywhere because she will be on a level unlike any other pedo duo in history. She will give me everything I ever wanted. It's coming. I am so close now.
>
> …
>
> These last few weeks I feel like I'm living in a special part of Hell reserved for burning desire that comes on strong but can never be satisfied. I have a student who is 10 now, looks like Gracel [prepubescent female victim of the "Gracel" child pornography series] exactly, same face, mouth, and body, same skin color. Big beautiful eyes. She's been my student 3 years now … my heart is aflame and burning hot, fueled by pedo lust that burns hotter than I think anyone else out there. It's been flaming for 20 years now, non stop. This girl is

6

my heart's desire. Recently I finally broke down and began to show
her Gracel videos and photos to show her that another girl who looks
like her was having sex with a male the same overall look of the man
in the Gracel videos. … When no one is alone with us in the room, I've
tried to kiss her, but she says no.

….

Last week i showed another girl, a new girl to my class, some
pedophilia of an asian girl who looks just like her too. It was a blowjob
picture. She squealed when she saw it, and stared at me the whole rest
of the class time.  … She is only 7 years old. Much younger, but totally
wild with lust girl.  …. This week standing over her desk, she reached
out and traced my cock with her finger, not once, but twice, while
looking up with bedroom eyes. …. I'm going to try and kiss her in the
back room if I can get her to follow me there. … The next time, maybe I
could get her to suck my dick for 10 seconds on camera. If so, I'll post it
in my private section and let you know. My god, she is so fucking fine.

At the time of these postings, EKLUND was an American citizen teaching
English to children in Wuhan, China. FBI agents informed Chinese authorities of
EKLUND's activities, and in October 2016, the Chinese authorities arrested
EKLUND and seized his computers. During the review of EKLUND's computers,
Chinese law enforcement found EKLUND's Gigatribe account and child
pornography images and videos. EKLUND admitted to Chinese authorities that he
used Gigatribe to obtain and share child pornography files. EKLUND was convicted
of violating China's pornography laws and sentenced to 18 months in prison.

On May 10-11, 2018, Chinese authorities deported EKLUND to the United
States where he was taken into federal custody by the FBI. In a post-arrest
statement, EKLUND admitted he has been has been "hooked like a drug addict" to
child pornography since he was a teenager. He admitted that he used Gigatribe and
that his user accounts included "Gigauser55," "Gigadude555," "Gigadude5555," and

7

"Kingofgiga55." EKLUND told agents he enjoyed the thrill of obtaining new child pornography and that his child pornography collection was over 2 terabytes. EKLUND also stated he would use his blog to request specific images and videos of child pornography from his Gigatribe "friends."

With regard to his Chinese students, EKLUND admitted that he was sexually attracted to young female students who were between the ages of 8 and 10 years old. He said one 10-year old girl was "flirty" with him and showed him her vagina. EKLUND was asked if this was the same girl he said he was in love with in one of his Gigatribe postings, and he said that was a different girl who was "all over him."

EKLUND further admitted that he wanted to see which girls in his class might be open to having sex with him, so he started showing them adult pornography. When that did not work, he showed them child pornography. EKLUND also explained he would play a "game" with his female students in which he would throw them in the air, catch them, and set them down—during the "game," he would strategically press his fingers on their clothing over their vaginas to try to stimulate them sexually. EKLUND explained that this "worked" and the girls began to bring their friends to the school. EKLUND said this continued for about one year. However, one student eventually complained about his activity to school administrators and he received a warning.

8

## III.   GUIDELINE CALCULATION

With regard to the guidelines, the parties agree that EKLUND's base offense level is 22 under U.S.S.G.§ 2G2.2(a)(2). The parties further agree that the following adjustments apply in this case: a two (2) level increase under 2G2.2(b)(2) because the material involved prepubescent minors; a two (2) level increase under 2G2.2(b)(6) because the conduct involved the use of a computer; a five (5) level increase under 2G2.2(b)(7)(D) because the defendant possessed more than 600 images of child pornography; a two (2) level increase under 2G2.2(b)(3)(F) because the offense involved distribution; a four (4) level increase under 2G2.2(b)(4) because the offense involved sadistic and masochistic conduct; and a three (3) level decrease because the defendant timely accepted responsibility. The resulting adjusted offense level is 34. Because EKLUND falls into criminal history category I, the resulting advisory guidelines range is 151 to 188 months imprisonment.

## IV.   THE GOVERNMENT'S SENTENCING RECOMMENDATION.

Sentencing courts must consider the factors outlined in 18 U.S.C. § 3553(a), including the need for the sentence "to reflect the seriousness of the offense, to promote respect for law, and to provide just punishment for the offense; [and] to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(A) and (B). The court must also consider the sentencing guidelines. In *United States v. Booker*, 543 U.S. 220, 264 (2005), the Supreme Court made clear that sentencing courts should "consult [the Sentencing] Guidelines and take them into account when sentencing." The Supreme Court provided this direction to promote the sentencing

9

goals of Congress, namely to "'provide certainty and fairness in meeting the purposes of sentencing, [while] avoiding unwarranted sentencing disparities[.]'" *Booker,* 543 U.S. at 264 (quoting 28 U.S.C. §991(b)(1)(B)).

### A. The Nature and Circumstances of the Offense, and the History and Characteristics of the Offender.

Christopher EKLUND maintained a vast collection of child pornography that he meticulously organized and encouraged others to access. He cherished his collection, and berated his child-abusing, online "friends" if they did not take similar care of their collections. His choice to collect, distribute, advertise, and chat about images and videos of children being raped and sodomized perpetuated the abuse of these innocent victims. Such harm was recognized years ago by the United States Supreme Court in *New York v. Ferber*, 458 U.S. 747, 758 (1982). In *Ferber*, the Supreme Court noted that, in the judgment of state and federal legislators, as well as authors of relevant literature, "the use of children as subjects of pornographic materials is harmful to the physiological, emotional, and mental health of the child." *Ferber,* 458 U.S. at 758 (citations omitted). The *Ferber* court also observed that the "[pornographic] materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation." *Id.* at 759 (citation omitted). Furthermore, the court stated:

> Pornography poses an even greater threat to the child victim than does sexual abuse or prostitution. Because the child's actions are reduced to a recording, the pornography may haunt [the victim] in future years, long after the original misdeed took place. A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography… It is the

Case 2:16-cr-00176-LA   Filed 02/15/19   Page 10 of 22   Document 27

fear of exposure and the tension of keeping the act secret that seem to have the most profound emotional repercussions.

*Id.* at 759 & n. 10 (citations omitted); *see also Osborne v. Ohio,* 495 U.S. 103, 109-10 (1990) (reaffirming *Ferber* in case involving possession of child pornography).

In 2002, the United States Supreme Court again acknowledged the harm to victims depicted in child pornography and observed that a new harm is caused each time the images are shared with someone different. *See Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 249 (2002). In *Free Speech Coalition,* the court noted that "as a permanent record of a child's abuse, the continued circulation itself would harm the child who had participated. Like a defamatory statement, each new publication of the speech would cause new injury to the child's reputation and emotional well-being." *Id.* at 249.

EKLUND readily celebrated the harm he inflicted on his victims. He was an active participant in a child-pornography-trading network on Gigatribe, bragging about the amount of content he made available for others to access. He also bragged about creating new child pornography videos from other child pornography clips, and he warned his "friends" that they should engage with him more regarding their shared love of child pornography or he may decide to quit Gigatribe.

EKLUND's conduct—collecting, sharing, and discussing child pornography— is what Congress had in mind in crafting and revising the statutory scheme aimed at "eliminat[ing] the exploitation of children in pornography materials." *United States v. Cunningham*, 680 F. Supp. 2d 844, 847 (N.D. Ohio 2010) (quoting Senate Rep. 95-438, 1978 U.S.C.C.A.N. 40, 41, 55). While the Internet has made it easier to

11

engage in this conduct, ease of criminality does not excuse criminal conduct. EKLUND's conscious decision to seek out, access, view, retain, and share images of children being violently raped and sodomized is not innocent or harmless. It is a key part of the machine the drives the sexual abuse of young children.

In fact, EKLUND's use of Gigatribe, a "closed" peer-to-peer program, represents a particular kind of evil that the Sentencing Commission referred to as "personal" distribution—direct contact between two people for the purpose of trading child pornography. *See* U.S. Sentencing Commission, *2012 Report to the Congress: Federal Child Pornography Offenses* ("U.S. Sentencing Commission 2012 Report"), 99.[1] According to the Commission, the use of closed peer-to-peer programs like Gigatribe to access and share child pornography, which in 2010 comprised about 29% of child pornography offenders who used peer-to-peer programs, see *id.* at 99, 154, provided the "clearest example of a child pornography market." *Id.* at 99. "Such personal distribution suggests some level of participation in a child pornography 'community,'" as opposed to the majority of child pornography-distribution offenders who engaged in "impersonal" distribution over "open" peer-to-peer networks. *Id.* at 166.

Another way defendants like EKLUND are connected to the child victims is that by possessing, receiving, and distributing the images, they are continually re-victimizing the children portrayed by violating their right to privacy. *See United*

---

[1] Report online at https://www.ussc.gov/research/congressional-reports/2012-report-congress-federal-child-pornography-offenses.

*States v. Sherman*, 268 F.3d 539, 546–47 (7th Cir. 2001) (citing cases, including *Ferber*, 458 U.S. at 759 n. 10). "Indeed, one of the reasons for criminalizing the 'mere' possession of child pornography is to create an incentive for the possessor to destroy the material, and alleviate some of these harms to the children depicted." *Id.* (citing *Osborne v. Ohio*, 495 U.S. 103, 111 (1990)).

That harm is evident in this case. The Court has a number of Victim Impact Statements in this case where these young children, some of them adults now, described the repeated victimization that occurs each time their pictures are distributed. The mother of one victim states "[t]he worst time of [my children's] lives have been permanently captured and perpetually kept in circulation." *See* Presentence Report, Doc. #24 (PSR) at 71. Another mother described how the victim cannot put the horror behind her because "men identify her from those pictures of her abuse and harass her. . . . Some have even sent her pictures of the abuse she endured as a child." PSR at 65.

EKLUND, who is 47 years old, admitted to being hooked on child pornography for over thirty (30) years, starting when he was a teenager. When he was arrested, his child pornography collection exceeded 2 *terabytes*[2] and he shared this collection with other child abusers. EKLUND was not simply an anonymous purveyor of child pornography; he reviewed and recommended child pornography to other users. For

---

[2] "A single TB is a lot of space. It would take 728,177 floppy disks or 1,498 CD-ROM discs to store just 1 TB worth of information." Tim Fischer, "*Terabytes, Gigabytes, & Petabytes: How Big Are They? An understandable guide to everything from Bytes to Yottabytes,*" *Lifewire,* January 7, 2019, *available at* https://www.lifewire.com/terabytes-gigabytes-amp-petabytes-how-big-are-they-4125169 (last visited February 15, 2019).

13

example, in one online chat, EKLUND described a video showing 6-year-old girl being anally raped, remarking that "she is enjoying it." *See* PSR ¶ 15.

EKLUND acted on his sexual interest in children in an escalating fashion. As noted above, his child pornography collection grew to 2 terabytes of content. He started creating compilation videos chronicling the sexual abuse of children. And, as he admitted in his post-arrest interview, he began to groom his young female students for sex by showing them adult and child pornography. PSR ¶ 25. He also made up a "game" with his students—throwing and catching them—so that he could touch their vaginas for sexual stimulation. He said he did this for over a year before one of the children complained. PSR ¶ 25.

EKLUND became fixated on his students and identified which ones would be his victims. In online chats, EKLUND discussed how, in one case, he targeted a student because he thought she resembled a child pornography victim known as Gracel. *See* PSR ¶ 21. According to EKLUND, she was 10 years old and every time he saw her, his "heart [was] aflame and burning hot, fueled by pedo lust that burns [hot]." PSR ¶ 21. In that discussion EKLUND admitted that he has been "25 years a pedo[phile]." PSR ¶ 21. In another Gigatribe chat session, EKLUND said he showed a 7-year-old female student some child pornography, got her to touch his penis in class, and that he was planning to "get her to suck my dick for 10 seconds on camera." PSR ¶ 21. He admitted to FBI agents that he got another one of his students, a 10-year-old girl, to show him her vagina.

With regard to EKLUND's history and characteristics, he appears to have had a tumultuous childhood with a mother whom he escribed as alcoholic. However, when he turned 18, he joined the military and left this behind. He has no significant criminal history (though the evidence in this case shows he has been involved in criminal child exploitation for decades), and no history of severe mental, physical, or substance abuse. There appears to be nothing that would have prevented EKLUND from being a positive asset to the community. EKLUND, however, chose a different path. He became part of a different "community," one that celebrated child sexual abuse.

His criminal conduct has now been exposed, and EKLUND must be held accountable for this actions. To his credit, EKLUND recognizes this fact. He timely confessed his conduct, he has expressed remorse, and he timely entered a guilty plea.

## B. The Need to Afford Adequate Deterrence to Criminal Conduct and Protect the Public from Further Crimes of the Defendant.

By his own admissions, EKLUND has attempted to, and has a strong desire to, sexually abuse young children. He shared images of their abuse, and he began to act on his desires. As noted above, EKLUND's sexual fascination with children was progressing exponentially over twenty years, and he readily admitted to being a pedophile. According to the DSM V, the diagnostic criteria of pedophilic sexual disorder are:

> A. Over a period of at least 6 months, recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children (generally age 13 years or younger).

15

B. The individual has acted on these sexual urges, or the sexual urges or fantasies cause marked distress or interpersonal difficulty.

C. The individual is at least age 16 years and at least 5 years older than the child or children in Criterion A.

*Diagnostic & Statistical Manual of Mental Disorders, 5th Ed.* Amer. Psych. Assn. (2013). EKLUND satisfies all of the medical criteria for pedophilic disorder. He is an adult who has had these urges for years. He has been unable to resist violating the law, and has repeatedly sought sexual gratification from the exploitation of prepubescent children. He has acted on these urges, by collecting, distributing, and attempting to produce child pornography. There is no reason to believe that he will stop being a pedophile when he is returned to the community.

EKLUND has a verified sexual attraction to children that makes him a danger. While no study can predict the likelihood of recidivism of a particular defendant, EKLUND poses a future danger to victims of child pornography because he is a pedophile with a long history of illegally exploiting the most vulnerable segment of our society. *United States v. Garthus*, 652 F.3d 715, 720 (7th Cir. 2011) ("Statistical analysis of sex crimes has shown that the best predictor of recidivism is not deportment at an interview but sexual interest in children." (citing R. Karl Hanson, et al., *Sexual Offender Recidivism Risk: What We Know and What We Need to Know*, 989 Annals of the N.Y. Academy of Sciences 154, 157 (2003) (tab.1))); *United States v. Pugh*, 515 F.3d 1179, 1201 (11th Cir. 2008) ("As Congress has found and as we have discussed, child sex offenders have appalling rates of recidivism and their crimes are under-reported."); *but see U.S. Sentencing*

*Commission 2012 Report* at 295-300 (reporting that the Commission's study of 610 non-production child exploitation offenders revealed a recidivism rate around 30%).[3] And while EKLUND is 47 years old, which makes him older than the average defendant, recidivism among pedophiles is does not necessarily follow the same downward trend with age as other offenses. *See generally* Ryan C.W. Hall & Richard C.W. Hall, *A Profile of Pedophilia: Definition, Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues*, 82 Mayo Clinic Proc. 457, 458 (2007) (noting that when compared with rapists and sexual sadists, pedophiles comprise 60% of all older offenders, indicating that pedophiles offend in their later years at a greater rate than other sexual offenders). Therefore, a significant sentence is appropriate to protect the community and victims of child pornography, and to provide specific deterrence to EKLUND.[4]

A significant sentence is also appropriate to deter other like-minded individuals with an interest in child pornography. As noted earlier, the Internet has made child pornography more accessible, which in turn spurs wider distribution of increasingly graphic depictions of child rape. Those who produce child pornography

---

[3] As most of these studies note, "it is widely accepted among researchers that sex offenses against children go unreported or undetected," which skews any study trying to determine recidivism rates. *See U.S. Sentencing Commission 2012 Report* at 295 (citing Ryan C.W. Hall & Richard C. W. Hall, *A Profile of Pedophilia: Definition, Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues*, 82 Mayo Clinic Proc. 457, 460–61 (2007)).

[4] To the extent EKLUND may argue that his online statements of wanting to sexually abuse his students was mere bravado, that argument should be met with extreme skepticism. EKLUND discussed his attempts to sexually assault children, how he touched them, and got them to touch him, which is consistent with his strong interest in child pornography.

17

are certainly distinguishable, as a matter of criminal law, from those who consume it, but both actors are involved in the sexual exploitation of children. Deterring both production and consumption is a worthwhile goal to which Congress, researchers, and law enforcement have committed extensive resources. Sentencing child pornography consumers plays a key role in this scheme because "[s]entences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor." *United States v. Goldberg*, 491 F.3d 668, 672 (7th Cir. 2007). "The logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so the more will be produced." *Id.*; *see also United States v. Goff*, 501 F.3d 250, 261 (3d Cir. 2007) ("[D]eterring the production of child pornography and protecting the children who are victimized by it are factors that should have been given significant weight at sentencing.").

## C. The Need to Avoid Unwarranted Disparities and Consideration of the Applicable Guidelines Range.

As noted, the parties have agreed on the applicable guideline range in this case. With that said, the government is aware that in many child pornography cases, defendants seek lower sentences by arguing that the child-pornography guideline provisions under U.S.S.G. § 2G2.2 are flawed for various reasons. Arguments raised by defendants include that the guidelines are not supported by empirical data, and that the routine application of certain enhancements makes them meaningless. For Christopher EKLUND, however, those arguments are not persuasive given the scope of his criminal activity.

18

First, while district courts certainly have the freedom to vary from the guidelines based on a disagreement with the guidelines, the guidelines remain the guidelines. They must be properly calculated, and they act as the starting point for any sentencing hearing. *See generally United States v. Huffstatler*, 571 F.3d 620, 624 (7th Cir. 2009) (affirming sentence within the applicable guidelines range for a child pornography defendant). Moreover, the child pornography guidelines reflect considerable effort by the U.S. Sentencing Commission to meet Congress's charge of curbing a type of heinous crime that grows continually in the dark corners of the internet. *See Cunningham*, 680 F. Supp. 2d at 850-52 ("The Commission appears to have gone above and beyond to justify its amendments. Far from failing to rely on empirical data and its own expertise, the Commission has conducted formal studies whenever possible and has conducted extensive analysis to fulfil its statutory obligations.").

Second, the fact that certain enhancements apply in most child pornography cases, such as those in this case, does not make them any less important. One does not need to use a computer to commit the crime of possessing child pornography, just as one does not need to possess images of prepubescent children or images depicting violence. The base offense level was set with this fact in mind, and each enhancement addresses a specific, aggravating aspect of the offense. The computer enhancement was enacted to curb the growth of child pornography on the Internet; the fact that internet child pornography is accessible (if one searches for it, which

19

takes effort) and pernicious is not a basis to reduce penalties.[5] Likewise, a person who seeks out images of children being violently raped deserves a higher offense level than someone whose conduct lacks that trait.

Here, EKLUND used his computer to access, download, save, distribute, and chat about images and videos depicting the cruel sexual torture of children and infants. The adjustments called for in this case, and agreed to by the parties, are fully justified.

On top of this, there are aggravating factors in this case that are not properly accounted for in the current guidelines. For instance, EKLUND possessed more than 600,000 images and videos, yet the applicable adjustment for number of images possessed remains the same whether he possessed 600 or 600,000 images. And the guidelines do not include an enhancement to account for EKLUND's active participation in an online forum of child pornography collectors, which the Sentencing Commission considers a particularly aggravating characteristic. *See U.S. Sentencing Commission 2012 Report*, at 323-24 (proposing a new guideline "specifically dealing with offenders' community involvement, as distinct from their

---

[5] It is certainly arguable that various enhancements under § 2G2.2 should be updated to reflect current technology and tends. The Department of Justice has provided comments on this point in the past. But this does **not** mean that Congress, the Commission, or the Department of Justice are advocating for lower sentences in all child pornography cases. The Commission's 2012 report noted that while certain provisions of § 2G2.2 may result in "overly severe guideline ranges for some offenders based on outdated and disproportionate enhancements related to their collecting behavior," it also results in "unduly lenient ranges for other offenders who engaged in aggravated collecting behaviors not currently addressed in the guideline," including those who were involved in child pornography communities (which, as noted, includes closed forums like Gigatribe). *See* U.S. Sentencing Commission 2012 Report at 321. And, Congress has repeatedly revised the child exploitation statutes to increase penalties and broaden covered conduct.

20

distribution conduct, [which would] better differentiate among offenders' culpability based on their degree of such community involvement."). Thus, any argument that certain enhancements over-represent the actual offense is rebutted by the omission of other enhancements that would more fully capture the extent of EKLUND's offense.

### D. The Need to Promote Respect for the Law and Provide Just Punishment.

The large volume and terrible content of EKLUND's child pornography collection make promoting respect for the law a key sentencing factor. EKLUND knew what he was doing, and he knew it was wrong, yet he assembled his vast collection over many years and made it accessible to others across the globe. He also engaged with other like-minded people to trade images of violent sexual abuse of children. Relatedly, by collecting and sharing images of vulnerable child victims, EKLUND has harmed those victims. His conduct is deserving of just punishment.

## V.   CONCLUSION

EKLUND actively participated in a community that reveled in sharing the most disturbing depictions of child sex abuse. He accumulated terabytes of child pornography that perpetuated the victimization of children over decades. By his own admission, his sexual attraction to children grew to the point where he started acting on his fantasies.

For the reasons discussed above, the United States believes that a sentence of within the applicable guidelines range of 151 to 188 months imprisonment is sufficient, but not greater than necessary, to best achieve the goals of sentencing.

Counsel for the United States intends to make additional comments at the sentencing hearing.

Dated in Milwaukee, Wisconsin, this 15th day of February, 2019.

MATTHEW D. KRUEGER
United States Attorney

By:   /s

BENJAMIN W. PROCTOR
Assistant United States Attorney
Benjamin Proctor Bar No.: 1051904
Attorney for Plaintiff
Office of the United States Attorney
Eastern District of Wisconsin
517 E. Wisconsin Ave. Suite 530
Milwaukee, Wisconsin 53202
Tel: (414) 297-1700
Fax: (414) 297-1738
Email: benjamin.proctor@usdoj.gov

/s

RALPH PARADISO
Trial Attorney
Criminal Division
Department of Justice
Child Exploitation & Obscenity Section
1400 New York Avenue, Suite 600
Washington D.C., 20530
Tel: 202.307.2830
Email: ralph.paradiso@usdoj.gov